UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Daniel S. Hodge,

        Plaintiff,

v.

Faribault County; Correctional Officer Joe
Anderson, Correctional Officer Kent
Boettcher, Correctional Officer Amber
Engebretson, Correctional Officer Kristin
McGowan, Correctional Officer Mitch
Murphy, and Correctional Officer Amber
Rasmussen, in their individual and official
capacities; Advanced Correctional
Healthcare, Inc. (ACH); and Molly Meier,
ACH employee, in her individual and
official capacities,

        Defendants.

Civil No. 14-3155 (JNE/SER)
MEMORANDUM
**(FILED UNDER SEAL)**

---

Zorislav R. Leyderman, The Law Office of Zorislav R. Leyderman, appeared for Daniel
S. Hodge.

Stephanie A. Angolkar, Iverson Reuvers Condon, appeared for Faribault County,
Correctional Officer Joe Anderson, Correctional Officer Kent Boettcher, Correctional
Officer Amber Engebretson, Correctional Officer Kristin McGowen,[1] Correctional
Officer Mitch Murphy, and Correctional Officer Amber Rasmussen.

Jonathan P. Norrie, Bassford Remele, PA, appeared for Advanced Correctional
Healthcare, Inc. (ACH), and Molly Meier.

---

On the afternoon of Friday, February 25, 2011, Daniel Hodge was arrested for

second degree domestic assault and terroristic threats.  He was taken to the Faribault

---

[1]    The Second Amended Complaint names "Correctional Officer Kristin McGowan"
as a defendant.  Her deposition indicates her last name is "McGowen."

County Jail.  Approximately one hour after his arrival at the jail, Hodge was transported

from the jail to a courthouse for a bail hearing.  After the hearing, Hodge was taken back

to the jail.  The next day, he posted bail and was released at approximately 4:15 p.m.

Claiming that he did not receive assistance he required to clean himself and that he was

left in his cell soiled in his own feces, Hodge brought this action against Faribault

County, correctional officers, a nurse who worked at the jail, and the company that

employed the nurse.  Hodge asserted claims under 42 U.S.C. § 1983 (2012) for violations

of the Fourteenth Amendment.  He also asserted a negligence claim and a claim for

violation of the Americans with Disabilities Act.  The case is before the Court on

Defendants' motions for summary judgment.  For the reasons set forth below, the Court

grants the motions.

## I.    BACKGROUND

*Contrast infiltration on February 24*

On Thursday, February 24, 2011, Hodge, who is right-handed, went to the Mayo

Clinic for a CT scan.  Contrast material was injected into his left arm.  Infiltration of the

material left his arm and hand swollen and painful.  According to his deposition

testimony, the pain level "[s]tayed the same" 24 hours later.  Forty-eight hours after the

procedure, it was "[a] little" better.  Seventy-two hours after the procedure, it had

improved "[a] little more."

*Arrest on February 25*

On Friday, February 25, 2011, Hodge and his wife argued.  His wife eventually

called the police.  After responding to the call, an officer interviewed Hodge's wife.

During the interview, Hodge's wife stated that Hodge had grabbed her hair, pushed her, held a knife to her neck, and threatened to kill her.  The officer also interviewed Hodge.  During the interview, Hodge denied that he had threatened his wife with a knife.  He stated that his wife had attacked him with a radio and that he had responded by punching her with a glancing blow to her stomach.  At 2:15 p.m., the officer arrested Hodge.  The officer called an ambulance to transport Hodge to jail.[2]

At her deposition, Hodge's wife testified that Hodge had held a knife to her throat and that he had threatened to kill her.  She also acknowledged that she had signed a letter in June 2012 in which she recanted her allegations against Hodge.

At his deposition, Hodge testified that he had not physically threatened his wife on February 25.  He denied grabbing his wife by her hair, holding a knife to her throat, punching her, or throwing anything.  He testified that he had "pushed, tried to push her away."[3]

---

[2]    During the interview, the officer noticed that one of Hodge's legs was bleeding. Hodge responded that diabetes probably caused the bleeding.  The officer also noticed that the lower portion of one of Hodge's legs appeared purple.  Hodge used a wheelchair. Years before his arrest, his left leg below his knee had been amputated, and part of his right foot had been amputated.  According to the affidavit of the arresting officer, who had had previous law enforcement contacts with Hodge, Hodge had "previously claimed he lost his feet as a result of how he was transported after a prior arrest."  The arresting officer chose to transport Hodge to jail in an ambulance "[t]o avoid being accused of causing any other physical injury."  After the arresting officer stated he was going to call an ambulance to transport Hodge to jail, Hodge asked, "Can't you call that Ride Share or that bus?"  The arresting officer responded, "No."

[3]    The state brought assault charges against Hodge as a result of the incident on February 25.  He entered an *Alford* plea to misdemeanor assault.  On appeal, Hodge challenged the sufficiency of the plea's factual basis.  The Minnesota Court of Appeals reversed and remanded: "[Hodge's] *Alford* plea was fatally deficient, the district court

*Jail on February 25 and 26*

Kent Boettcher booked Hodge into the jail.  According to Boettcher, Hodge and

the jail programmer, Joe Anderson, had a conversation in the booking room.  After the

conversation, Boettcher, who had been in the pod control room, went to the booking

room and booked Hodge into the jail.  As part of the booking process, Boettcher asked

Hodge about his physical and mental health.  Boettcher recorded Hodge's responses on a

medical screening admission form.  The form indicates that Hodge had an inhaler for

asthma, had medications for hypertension, and took insulin for diabetes.  With respect to

arthritis, the form states that Hodge "has some pain meds/has pills for gout."  After

completing the medical screening admission form, Boettcher took photographs of Hodge.

Hodge changed clothing.  Boettcher brought him to a cell.  An entry in a jail log at 3:33

p.m. states that Hodge was moved to the G pod.  After reviewing the daily schedule with

Hodge, Boettcher asked whether Hodge had any questions.  According to Boettcher,

Hodge responded, "[S]o which one of you guys is going to wipe my ass."  Boettcher

replied, "[N]obody here does that."  Hodge stated, "[W]ell, my wife does it for me at

home."  Boettcher walked away without responding.  Given the manner in which Hodge

had made the statements, Boettcher did not interpret them as requests for assistance.

---

accepted the plea in error, and [Hodge] is entitled to withdraw his guilty plea." *State v.
Hodge*, No. A12-1998, 2013 WL 4404582, at *4 (Minn. Ct. App. Aug. 19, 2013).  On
remand, Hodge pleaded guilty to disorderly conduct.  At his change-of-plea hearing,
Hodge testified that his wife was listening to a radio, that the radio was on a kitchen
counter, that he "grabbed the radio," that he tried to throw it out of the back door, and
that he knew his actions would make his wife angry or upset.

Anderson testified that he first encountered Hodge on February 25 when Boettcher called Anderson to the booking room at Hodge's request.  Hodge told Anderson about the infiltration of the dye, showed his left arm to Anderson, and asked where he was going to be kept given his use of a wheelchair.  Anderson replied that Hodge would be placed in a handicapped-accessible cell[4] and that Anderson would attempt to secure a court hearing for Hodge as soon as possible.  The conversation lasted a minute or two.  Anderson left, called the state district court, and asked whether Hodge could appear before the court that day.  The court responded affirmatively.

Hodge testified that Anderson was one of the first individuals he encountered at the jail.  Hodge thought a female officer booked him into the jail, but he was not sure.  He said that he needed help when he used the bathroom.  Asked what help he needed, he said cleaning himself.  He was told no such help would be provided.  He gave a urine sample and changed clothing as part of the booking process.  He did not require assistance to accomplish either task.  After the booking process was complete, he testified that a different officer, a male, brought him to his cell.  He initially denied appearing in court on February 25.  Later, he acknowledged that he was taken to court on February 25.  He recognized that he would not have been able to post bail on Saturday, February 26, had he not appeared in court on February 25.

Anderson testified that he took Hodge to court on February 25 in a truck.  An entry in the jail log at 3:51 p.m. states that Hodge left the jail to go to court.  According to

---

[4]     According to Anderson, "G pod is considered a medical cell."  It was handicapped-accessible.  A small day room had a table and a shower stall.  A locked door separated the day room from a room that had a bed, a sink, and a toilet.

Anderson, Hodge was able to enter the truck at the jail and exit the truck at the court without assistance.  Anderson did not recall any conversations with Hodge on the way to court.  They did not talk about anything that had occurred in court.[5]  On the way back to jail, Anderson explained the process for Hodge to post bail.  Hodge was able to exit the truck without assistance.  Anderson retrieved Hodge's wheelchair, Hodge sat in it, and Anderson left Hodge in the booking area with an officer.

On February 25 and 26, Hodge had diarrhea.  Hodge testified that he used the toilet "[i]mmediately" after arriving in his cell.  As of approximately 5 p.m. on February 25, he had used the toilet two or three times in his cell.  For each bowel movement, he was able to transfer himself from his wheelchair to the toilet and from the toilet to his wheelchair without assistance.  Asked to describe how he cleaned himself after each bowel movement, Hodge stated that he tried to reach back to clean himself but could not reach and that he was able to grab toilet paper with his hands but was unable to contact his bottom with the paper.  Reminded that he was under oath, Hodge testified that he "got [his] outside, you know, not in the crack."  He testified that he "could not clean the outside either" and that he "could touch it but [he] didn't have the finger strength because

---

5    Faribault County and the correctional officers cited Anderson's deposition to support the following proposition: "When he appeared before the district court judge, Hodge did not request a medical furlough and after bail was set, he was returned to jail." The cited portion of Anderson's deposition contains the following question: "Do you recall any conversations with [Hodge] on the way back from court?"  Anderson responded affirmatively.  In the exchange that immediately followed, Anderson denied talking with Hodge about "anything in court."  Anderson then testified that he discussed release conditions with Hodge as they returned to jail.

of the fingers being swelled up that [he] could move [his] fingers."[6]  He did not know

whether fecal matter remained on the outside of his bottom after his efforts to clean

himself.

At approximately 5 p.m. on February 25, an individual who identified herself as a

nurse woke Hodge up and asked him questions about his medications.[7]  The nurse

remained in the hallway outside of G pod.  She yelled through a slot in the door.  Hodge

remained in the bed in the back room.[8]  He never saw her.  After Hodge had answered

her questions, the nurse thanked him and stated it was time for her to leave.  As the nurse

was walking away, Hodge hollered at her to ask for help.  Specifically, he asked for help

cleaning himself on the toilet.  At some point, he also told her about the dye infiltration.

According to Hodge, the nurse responded that it was not in her job description to clean

him on the toilet.  She walked away.  Hodge went back to sleep.

After his conversation with the nurse, Hodge had several interactions with

correctional officers on February 25.  The jail log indicates that Mitch Murphy had a

conversation with Hodge about medications at approximately 7:30 p.m. and that Murphy

had another conversation with Hodge about medications about 50 minutes later.  At his

deposition, Murphy stated that he had no recollection of the conversations.  At

---

[6]     Hodge testified that he was experiencing a gout attack at the jail.

[7]     Advanced Correctional Healthcare, Inc. (ACH), provided certain healthcare
services at the Faribault County jail.  Meier was employed as a nurse by Advanced
Correctional Healthcare.  She worked at the jail on February 25 from 3 p.m. to 5 p.m.

[8]     Hodge testified that he was able to transfer from his wheelchair to his bed without
assistance.

approximately 9:55 p.m., Amber Engebretson checked Hodge's blood sugar level and administered insulin shots to him.  A few minutes later, the jail log states that Hodge was the given the opportunity to go to the library and the commissary and that he declined.  At his deposition, Hodge stated that he did not receive such an offer.  Hodge did recall a conversation with a male correctional officer at approximately that time.  Hodge testified that he asked the officer for a new set of clothes because his clothes were soiled with feces.  According to Hodge, the officer responded that he could receive new clothing on Tuesday.  Murphy had no recollection of any interaction with Hodge around 10 p.m.  Hodge also recalled that a shower chair was provided to him on Friday evening.  Kristin McGowen testified that she provided it to him.  The following notes about the shower chair appear in an "officer pass on information" sheet: "shower chair done!" and "Hodge requested our help with him showering!  haha."  McGowen testified that she wrote the notes.  After her deposition, McGowen changed her testimony to indicate she was not sure whether she had written "done!" and "Hodge requested our help with him showering!  haha."

At approximately 7 a.m. on Saturday, February 26, Amber Rasmussen checked Hodge's blood sugar level and gave his medications to him.  A short time later, she distributed bedding to Hodge and others.

On Saturday morning, Hodge had approximately two loose bowel movements.  Before one of them, he exhausted his supply of toilet paper.  He asked a female officer for more toilet paper.  According to Hodge, the officer responded that inmates were outside of their cells, that she was too busy to bring him additional paper at that time, and

8

that she would bring him more when she could.  Hodge received more toilet paper several

hours later.  Asked how he wiped himself without toilet paper, Hodge responded,

"Didn't, just pulled my pants up."  He also stated that he cleaned himself with his hand.

An officer brought Hodge a new set of clothing midday.

At approximately 1 p.m., Engebretson brought a cordless telephone to Hodge.  He

used it to call an attorney.

At 2 or 2:30 p.m., Hodge took a shower.  Asked whether he was able to shower by

himself, Hodge responded, "I got it done.  I didn't do a great job, but I got it done."  After

he had showered, Hodge met his brother and a bondsman and posted bail.  Hodge was

released from the jail at approximately 4:15 p.m.  Before he left the jail, Hodge's own

clothing was returned to him and he changed into it without assistance.

As a result of his inability to wipe himself and exhaustion of his supply of toilet

paper, Hodge asserted that feces were spread throughout his cell.  He called the toilet

"dirty":

> My room was a mess and I was trying to get it cleaned up because
> when I use the toilet it was dirty.  I just sit right back on it.

> If I would get cleaned up myself a little bit, I could sit right back on
> it and get dirty again.

He testified that his bedding was soiled with fecal matter.  He did not know how much

was on the sheets.  Hodge testified that he "rolled it up" and that "[e]very time [he]

jumped in bed [he] put another blanket or another sheet on top of it so [he] didn't have to

lay directly on it."  When he left his cell, he testified that he left the soiled bedding in a

plastic container in the cell.  Hodge testified that feces were on the bars by the toilet:

> [W]hen I was trying to clean myself I did get feces on my hands and when
> I'm trying to stand up and balance myself and trying to clean myself I think
> I transferred some, and I did try.  I did use toilet paper to try to clean it up,
> but all I was doing was spreading it around.

Hodge also testified that feces were on the sink and on the floor by the toilet.  He did not

know whether there were feces on the wall.

Near the end of his deposition, Hodge testified that he had had about five bowel

movements while he was in jail on February 25 and 26 and that he had asked

"[e]verybody he came in contact with" for help cleaning himself.  He estimated he had

asked for help cleaning himself "[s]ix or seven" times and for help showering "[t]wo or

three times."  He testified that he told the "jailer" and the nurse to take him to the hospital

if the jail staff was unable to care for him.

An inmate was assigned to clean Hodge's cell after Hodge's release.  According to

the inmate, there were feces on the wall by the bed, on the wall by the shower, and on the

wall by the sink and the toilet.  In the shower, there were feces on a stool, on buttons to

control the water, and on the floor.  There were feces on the mattress.  A trail of feces led

from the bed to the shower.  There were feces on the table in the cell's front room.  The

inmate described the cell as "nasty as hell."  The inmate testified that it required a couple

of hours to clean the cell.

## II.    DISCUSSION

Hodge's Second Amended Complaint contains four counts.  In Count 1, he

asserted claims against the individual defendants under § 1983 for violations of his rights

under the Fourteenth Amendment.  In Count 2, Hodge asserted claims under § 1983

against Faribault County and Advanced Correctional Healthcare for violations of his rights under the Fourteenth Amendment.  In Count 3, Hodge asserted a claim against Faribault County and Advanced Correctional Healthcare for violations of the Americans with Disabilities Act.  In Count 4, he asserted a negligence claim against each defendant. Faribault County, Anderson, Boettcher, Engebretson, McGowen, Murphy, and Rasmussen moved for summary judgment.  Advanced Correctional Healthcare and Meier separately moved for summary judgment.  Hodge opposed the motions only with respect to Count 1.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the absence or presence of a genuine dispute," or show "that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A)-(B).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).  In determining whether summary judgment is appropriate, a court must view genuinely disputed facts in the light most favorable to the nonmovant, *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009), and draw all justifiable inferences from the evidence in the nonmovant's favor, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

11

## A.    Count 1

In Count 1, Hodge alleged that the individual defendants violated his rights under the Fourteenth Amendment by depriving him of a liberty interest in bodily integrity "when they left him inside the cell soiled in his own feces and refused to assist or clean him in any way."  Hodge also alleged that the individual defendants violated his rights under the Fourteenth Amendment "through their deliberate indifference towards serious risk of harm to [him] and [his] serious medical needs."  The individual defendants asserted that they are entitled to qualified immunity.  Hodge opposed their assertion of qualified immunity, arguing that they deliberately disregarded his serious medical need and that they subjected him to unconstitutional conditions of confinement.

"Qualified immunity shields a government official from liability unless his conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'  Qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'"  *Burns v. Eaton*, 752 F.3d 1136, 1139 (8th Cir. 2014) (citation omitted).  A court applies a two-step inquiry to determine whether qualified immunity applies: (1) whether the facts shown by the plaintiff demonstrate a violation of a constitutional right; and (2) whether that right was clearly established at the time of the defendant's alleged misconduct.  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Peterson v. Kopp*, 754 F.3d 594, 598 (8th Cir. 2014).

*Deliberate indifference to a serious medical need*

"As a pretrial detainee, [Hodge's] right to medical care arises under the Due Process Clause of the Fourteenth Amendment.  Although [his] claim is rooted in the

12

Fourteenth Amendment, [the Court applies] the deliberate-indifference standard that governs claims brought by convicted inmates under the Eighth Amendment." *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014) (citation omitted).

"Whether an official was deliberately indifferent requires both an objective and a subjective analysis." *Id.* Hodge must show that he suffered from an objectively serious medical need and that the individual defendants knew of the need but deliberately disregarded it. *Hall v. Ramsey Cnty.*, 801 F.3d 912, 920 (8th Cir. 2015); *Jackson*, 756 F.3d at 1065. "To be objectively serious, a medical need must have been 'diagnosed by a physician as requiring treatment' or must be 'so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'" *Jackson*, 756 F.3d at 1065 (quoting *Scott v. Benson*, 742 F.3d 335, 340 (8th Cir. 2014)).

In his response to Defendants' motions, Hodge asserted that he had an objectively serious medical condition that required medical treatment. According to Hodge, the Mayo Clinic's records demonstrate that he sustained an injury to his arm that was diagnosed as requiring medical treatment. Under "CT Assessment Comments," the records state:

> IV infiltrate of approximately 200cc of visipaque in left upper arm. Patient's arm appears swollen and patient complaining of pain. Ice pack applied immediately to arm and IV removed. Patient will be sent out with hot and cold packs to be alternated throughout the day and instructed to elevate the arm as much as possible.

On March 14, 2011, Hodge spoke to a doctor from the Mayo Clinic. According to its records, Hodge stated he "had some improvement in the swelling but now states that he is having significant pain on the back of his hand with a feeling that '[his] fingers will

pop.'"  On March 16, 2011, Hodge returned to the Mayo Clinic.  According to its records, "[h]e was provided with a prescription for physical therapy to include hand motion and edema control that he can use with a local therapist."  In addition to the Mayo Clinic's records, Hodge maintained that his physical condition at the jail revealed that he had a serious medical need.  He is an amputee, he used a wheelchair, and his arm was swollen.  He maintained his disabilities and swollen arm "were so obvious that even a layperson could easily recognize [his] need for assistance with toileting and showering."  At the motion hearing, Hodge explained that his claim is not based on a failure to provide medical treatment to his arm.

No physician diagnosed Hodge as requiring assistance with toileting and showering.  His condition was not such that it would have been obvious to a layperson that he required such assistance, let alone a doctor's attention.  Without assistance, he was able to enter and exit the vehicle used to transport him to court; he gave a urine sample; he changed clothing; and, in his cell, he transferred from his wheelchair to the toilet, from the toilet to his wheelchair, and from his wheelchair to the bed.  He admitted that he was able to hold toilet paper in his hands and make some contact with his buttocks.  After he had received a shower chair, he showered without assistance.  Viewed in the light most favorable to Hodge, the record does not demonstrate the objectively serious medical need claimed by Hodge.  *See Clark v. Md. Dep't of Pub. Safety & Corr. Servs.*, 316 F. App'x 279, 283 (4th Cir. 2009) (unpublished per curiam) ("[L]eaving [plaintiff] sitting in his own waste, though offensive, does not amount to deliberate indifference to a serious medical need.").  Because Hodge failed to demonstrate an

14

objectively serious medical need, the Court concludes that the individual defendants are entitled to qualified immunity on Hodge's claim of deliberate indifference to a serious medical need.

*Conditions of confinement*

"Under the Fourteenth Amendment, a pretrial detainee's constitutional rights are violated if the detainee's conditions of confinement amount to punishment." *Stickley v. Byrd*, 703 F.3d 421, 423 (8th Cir. 2013) (quoting *Morris v. Zefferi*, 601 F.3d 805, 809 (8th Cir. 2010)). "In considering whether the conditions of pretrial detention are unconstitutionally punitive, [a court reviews] the totality of the circumstances of a pretrial detainee's confinement." *Morris*, 601 F.3d at 810.

Pretrial detainees are entitled to reasonably adequate sanitation, particularly over a lengthy period of time. *Id.*; *see Turner v. Mull*, 784 F.3d 485, 491 (8th Cir. 2015); *Whitnack v. Douglas Cnty.*, 16 F.3d 954, 957 (8th Cir. 1994). "Conditions, such as a filthy cell, may 'be tolerable for a few days and intolerably cruel for weeks or months.'" *Whitnack*, 16 F.3d at 958 (quoting *Howard v. Adkison*, 887 F.2d 134, 137 (8th Cir. 1989)). "While the length of time a prisoner must endure an unsanitary cell is undoubtedly one factor in the constitutional calculus, the degree of filth endured is surely another, and in our view, the length of time required before a constitutional violation is made out decreases as the level of filthiness endured increases." *Id.*

The Court assumes that the conditions of Hodge's cell were as he described them.[9] He was moved to his cell at approximately 3:30 p.m. on February 25. About 20 minutes later, he was taken to court for a bail hearing. The hearing took place, bail was set, and Hodge returned to the jail. Although he could have posted bail at any time thereafter, he secured his release by posting bail the following afternoon. Hodge spent, at most, 24 hours in his cell. During that time, he had approximately five loose bowel movements. Hodge was unable to adequately clean himself, and feces were spread throughout his cell. His clothing and bedding were soiled, and he rolled up or covered the soiled bedding so as not to sleep directly on it. Hodge exhausted his supply of toilet paper on the morning of February 26; he received more several hours later. He received fresh bedding on the morning of February 26 and clean clothing later that day. A shower was available to him in his cell,[10] he received a shower chair on the night of February 25, and he showered a couple of hours before his release. Viewing the record in the light most favorable to Hodge, the Court concludes that the conditions of Hodge's confinement do not amount to a constitutional violation in light of the brevity of his confinement. *See Turner*, 784 F.3d at 491; *Stickley*, 703 F.3d at 423-24; *Whitnack*, 16 F.3d at 957-58. Because Hodge failed to demonstrate unconstitutional conditions of confinement, the Court concludes that the individual defendants are entitled to qualified immunity on this claim.

---

[9]   Faribault County and the correctional officers disputed Hodge's account, noting that they would have documented feces in Hodge's cell and that they did document another inmate's incontinence that very weekend.

[10]   Anderson testified that G pod's shower is available from 7 a.m. to 11 a.m., from 12:30 p.m. to 5 p.m., and from 6:30 p.m. to 10:30 p.m.

**B.      Remaining counts**

Defendants made several arguments in support of their motions for summary

judgment on the remaining counts asserted by Hodge.  Hodge did not dispute that

Defendants are entitled to summary judgment on these counts, and he did not contest

Defendants' assertion that he had abandoned them.  Defendants' motions are well

supported.  The Court grants summary judgment to Defendants on Counts 2, 3, and 4.

## III.    CONCLUSION

In short, the Court grants the motions for summary judgment and dismisses this

action.  The Court will issue a separate order that is consistent with this Memorandum.

Dated: January 19, 2016

s/ Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge